J-S19002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES BYRD, | |
| Appellant | No. 2135 EDA 2015 |

Appeal from the Judgment of Sentence Entered January 23, 2015
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0005643-2013

BEFORE:  BENDER, P.J.E., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED APRIL 13, 2016**

Appellant, James Byrd, appeals from the judgment of sentence of 9 to 22 years' incarceration, imposed after a jury convicted him of several counts of robbery, and one count of fleeing or eluding a police officer.  Appellant seeks to argue that the court abused its discretion by denying his pretrial Pa.R.Crim.P. 600 motion to dismiss, and that the evidence was insufficient to support his convictions.  Additionally, Appellant's counsel, John F. Walko, Esq., seeks to withdraw his representation of Appellant pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v Santiago***, 978 A.2d 349 (Pa. 2009).  After careful review, we affirm Appellant's judgment of sentence and grant counsel's petition to withdraw.

In June of 2013, Appellant was arrested and charged, in two separate cases, based on his involvement with two cohorts in an armed robbery of a

bank in Montgomery County, Pennsylvania. Following a jury trial that concluded on July 18, 2014, Appellant was convicted, in the above-captioned case, CP-46-CR-0005643-2013 (hereinafter "Case No. 1"), of three counts of robbery - threat of immediate serious bodily injury, 18 Pa.C.S. § 3701(a)(1)(ii); one count of robbery - demanding money from a financial institution, 18 Pa.C.S. § 3701(a)(1))vi); and fleeing or attempting to elude a police officer, 75 Pa.C.S. § 3733(a). On January 23, 2015, Appellant was sentenced to 6 to 12 years' imprisonment, to run consecutively to a term of five to ten years' imprisonment that was imposed in a separate case (hereinafter "Case No. 2").[1]

The trial court's docket indicates that on January 28, 2015, Appellant filed a *pro se* motion for reconsideration of his sentence in the present case, Case No. 1. On March 13, 2015, the court issued an order denying that motion. However, according to the trial court's opinion, it subsequently learned from defense counsel "that the parties were negotiating a reduced sentence for [Appellant] because of cooperation [he] had rendered in another case." Trial Court Opinion (TCO), 10/20/15, at 2. The court goes on to explain that,

> on March 24, 2015, the undersigned signed a stipulated order
> presented by counsel rescinding our [March 13, 2015] order

---

[1] It is unclear from the record before us if Case No. 2 was related, in any way, to Case No. 1.

denying [Appellant's] post-sentence motion. Counsel captioned this stipulated order under both Case No. [1] and Case No. [2].

On April 27, 201[5], [the district attorney] emailed the undersigned to report that he and [defense counsel] had reached an agreement to reduce [Appellant's] case in Case No. [2]. Accordingly, by order dated April 27, 2014, the undersigned entered an order reflecting that agreement and amending the sentence imposed in Case No[. 2] to reflect a reduced sentence on Count I in that case.

Counsel [for both parties] subsequently informed the undersigned that they had negotiated a further reduction in [Appellant's] sentence. Counsel presented the undersigned with an agreed order further reducing [Appellant's] sentence in Case No. [2]. The order did *not* modify [Appellant's] sentence in Case No. [1], but provided that, given the reduction of sentence in Case No. [2], "the aggregated sentence under … [Case No. 1 and Case No. 2] shall be not less than nine years nor more than twenty-two years['] incarceration in a State Correctional Institution." The undersigned signed counsel's agreed order on June 12, 2015, and the order was formally docketed on June 15, 2015. Although we believe that the agreed order presented by counsel was intended to resolve [Appellant's] request for modification of his sentence in its entirety, [*i.e.,* in both Case No. 1 and Case No. 2,] counsel captioned this order only under Case No. [2], as a result of which it was not docketed of record in Case No. [1].

On July 8, 2015, [Appellant] mailed to this court a *pro se* notice of appeal in Case No. [1], which was formally docketed on July 15, 2015. We believe that [Appellant's] notice of appeal is at least arguably timely, given that it was mailed within thirty days of our June 15, 2015 order modifying [Appellant's] sentence. By order dated July 31, 2015, the undersigned appointed John F. Walko, Esquire, to represent [Appellant] as appellate counsel.

By separate order dated July 31, 2015, the undersigned directed [Attorney] Walko to file of record a statement of errors complained of on appeal, pursuant to [Pa.R.A.P.] 1925(b). In order to allow [Attorney] Walko sufficient time to review the voluminous record in this case and to assure himself that all relevant proceedings had been transcribed, the undersigned subsequently entered an order on September 9, 2015 granting

[Attorney] Walko twenty-one days from that date – or the date on which all relevant transcripts were docketed – to file [Appellant's] Rule 1925(b) statement. The undersigned received a copy of [Attorney] Walko's [Pa.R.A.P. 1925(c)(4)] statement of intention to file an **Anders**/**Santiago** brief on September 29, 2015.

TCO at 2-3.

On December 2, 2015, Attorney Walko filed with this Court a petition to withdraw. He also filed an **Anders** brief, asserting that the two claims Appellant wishes to raise on appeal are frivolous, and that Appellant has no other non-frivolous issues he could assert on appeal.

> This Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant]. **Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*).
>
> Prior to withdrawing as counsel on a direct appeal under **Anders**, counsel must file a brief that meets the requirements established by our Supreme Court in **Santiago**. The brief must:
>
> > (1) provide a summary of the procedural history and facts, with citations to the record;
> >
> > (2) refer to anything in the record that counsel believes arguably supports the appeal;
> >
> > (3) set forth counsel's conclusion that the appeal is frivolous; and
> >
> > (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> **Santiago**, 978 A.2d at 361. Counsel also must provide a copy of the **Anders** brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed pro se on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in

- 4 -

the ***Anders*** brief." ***Commonwealth v. Nischan***, 928 A.2d 349, 353 (Pa. Super. 2007), *appeal denied*, 594 Pa. 704, 936 A.2d 40 (2007).

***Commonwealth v. Orellana***, 86 A.3d 877, 879-880 (Pa. Super. 2014). After determining that counsel has satisfied these technical requirements of ***Anders*** and ***Santiago***, this Court must then "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (citations and footnote omitted).

In this case, Attorney Walko's ***Anders*** brief substantially complies with the above-stated requirements. Namely, he includes a summary of the relevant factual and procedural history, he refers to portions of the record that could arguably support Appellant's claims, and he sets forth his conclusion that Appellant's appeal is frivolous. He also explains his reasons for reaching that determination, and supports his rationale with citations to the record and pertinent legal authority.[2] Attorney Walko also states in his

_____

[2] However, we note, with displeasure, that Attorney Walko provides minimal citations to the trial notes of testimony in his statement of the facts, and provides *no* citations to the transcripts in his discussion of Appellant's sufficiency of the evidence claim. This failure on counsel's part is especially problematic in our review of Appellant's claims because the trial court did not set forth any meaningful discussion of Appellant's issues in its Rule 1925(a) opinion. ***See*** TCO at 4 (addressing Appellant's two issues by stating only "that the record on its face establishes that the Commonwealth presented sufficient evidence to convict [Appellant] of all of the crimes of which the jury found [him] guilty, and that our July 14, 2014 denial of [Appellant's] Rule 600 motion was proper and fully supported on the face of the record"). Additionally, the Commonwealth did not file a brief in this case but, instead, merely submitted a letter informing this Court "that it does not

*(Footnote Continued Next Page)*

petition to withdraw that he has supplied Appellant with a copy of his *Anders* brief, and he attaches a letter directed to Appellant in which he informs Appellant of the rights enumerated in *Nischan*. Accordingly, counsel has substantially complied with the technical requirements for withdrawal. We will now independently review the record to determine if Appellant's issues are frivolous, and to ascertain if there are any other non-frivolous issues he could pursue on appeal.

Appellant first seeks to challenge the trial court's denial of his pretrial, Rule 600 motion to dismiss the charges against him. Our scope and standard of review for such claims is well-settled:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review ... is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.
>
> Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the

*(Footnote Continued)* ———————

believe there is merit to any issue and that the judgment of sentence should be affirmed." Commonwealth's Letter at 1.

- 6 -

protection of the accused's speedy trial rights, and (2) the protection of society.

…

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters ..., courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Ramos*, 936 A.2d 1097, 1100 (Pa. Super. 2007) (*en banc*) (quoting *Commonwealth v. Hunt*, 858 A.2d 1234, 1238 (Pa. Super. 2004) (*en banc*)).

Rule 600(A)(2)(a) requires that a trial commence within 365 days of the filing of the written complaint.[3]

> The mechanical run date is the date by which the trial must commence under [Rule 600]. It is calculated by adding 365 days (the time for commencing trial under [Rule 600]) to the date on which the criminal complaint is filed. As discussed herein, the mechanical run date can be modified or extended by adding to the date any periods of time in which delay is caused by the defendant. Once the mechanical run date is modified accordingly, it then becomes an adjusted run date.

If the defendant's trial commences prior to the adjusted run date, we need go no further.

*Ramos*, 936 A.2d at 1102 (internal citation and footnote omitted).

_____

[3] Rule 600 was revised in 2012, and the current version of the rule became effective on July 1, 2013, prior to Appellant's filing of his pretrial motion to dismiss.

Here, the Commonwealth filed an initial criminal complaint on June 20, 2013, which it later withdrew and refiled charges on July 19, 2013. Appellant argued, in his pretrial motion to dismiss, that the Rule 600 calculations should commence on the filing date of the first complaint, making the mechanical run date June 20, 2014. Because his trial began on July 15, 2014, he maintained that Rule 600 was violated and the charges against him should be dismissed. The Commonwealth, however, contended that the July 19, 2013 criminal complaint governed for Rule 600 purposes, making Appellant's trial within the mechanical run date of July 19, 2014. *See* N.T. Hearing, 7/14/14, at 10-11, 14-16.

Alternatively, the Commonwealth maintained that even if the original filing date of June 20, 2013, was used, there was excludable time that made Appellant's trial fall within the *adjusted* run date. Specifically, the Commonwealth argued that the time between January 16th and March 13th of 2014 was excludable time. To prove this point, the Commonwealth presented a "Call of The Trial List Order[,]" which indicated that on January 16, 2014, "the defense" requested that the case be relisted for a later 'call of the trial list.' The next call of trial list was on March 13, 2014. At the pretrial hearing on Appellant's Rule 600 motion, the Commonwealth argued that this 56-day defense continuance should be excluded from the Rule 600 calculations, making the adjusted run date August 14, 2014. Because Appellant's trial commenced on July 15, 2014, the Commonwealth argued that there was no Rule 600 violation.

In response, Appellant's counsel argued that the continuance request was made by one of Appellant's then-codefendants, who had to obtain new counsel, and, thus, that time should not be attributable to Appellant. *See* N.T. Hearing at 27. However, in regard to whether Appellant had expressed an objection to the continuance, defense counsel could only vaguely state that he "recollect[ed]" that an objection was made, but he could not point to any place in the record to confirm that fact, nor even recall the "exact date" on which an objection was lodged. *Id.* Instead, counsel could state only that an objection was made "sometime in between" January 16th and March 13th of 2014. *Id.*

The Commonwealth, however, pointed out that Appellant's motion to dismiss did not mention, let alone challenge, the time between January 16th and March 13th being attributed to the defense, in general, rather than to one particular codefendant. Thus, the Commonwealth argued that Appellant had not complied with Rule 600(D)(3). *See id.* at 28.

We agree with the Commonwealth. Rule 600 directs the trial court to, *inter alia*, identify the party requesting the continuance, and "record to which party the period of delay caused by the continuance shall be attributed." Pa.R.Crim.P. 600(C)(3)(a)(ii). To challenge a court's determination in this regard, a defendant must raise such a claim in their Rule 600 motion to dismiss. *See* Pa.R.Crim.P. 600(D)(1)-(3). Here, Appellant did not challenge, in his motion to dismiss, the at-issue, 56-day delay being attributable to him, rather than to one of his codefendants. He

also was only able to vaguely state at the hearing that the continuance was due to his codefendant, and that he lodged an objection at some point between January 16th and March 13th of 2014.

Because Rule 600 expressly states that "periods of delay caused by the defendant shall be excluded" from Rule 600 calculations, the 56-day defense continuance between January 16th and March 13th was excludable. Adding this time to the June 19, 2014 mechanical run date results in an adjusted run date of August 14, 2014. Appellant's trial began on July 15, 2014, and, thus, no Rule 600 violation occurred.[4] Accordingly, we agree with Attorney Walko that challenging the trial court's denial of Appellant's Rule 600 motion would be frivolous.

Appellant next seeks to challenge the sufficiency of the evidence to sustain his convictions.

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all

---

[4] Additionally, we note that Appellant baldly asserted at the pretrial hearing that only 30 of the 56 days between January 16th and March 13th of 2014 should be excluded from the Rule 600 calculations. However, he provided no legal authority, or compelling argument, to support that position. *See* N.T. Hearing at 27 (defense counsel's simply stating that "any delay in excess of 30 days should not be attributable to [Appellant]" because, "[c]ertainly[, Appellant] can't be expected[,] if he did request a continuance[,] to be requesting a continuance for an infinite amount of time"). In any event, even if only 30 days should have been attributed to Appellant, the resulting adjusted run date would have been July 19, 2014, and Appellant's trial began on July 15, 2014.

reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno,*** 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. ***Commonwealth v. Hartzell,*** 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

Appellant was convicted of several counts of robbery, as defined by the following provisions of 18 Pa.C.S. § 3701(a):

(1) A person is guilty of robbery if, in the course of committing a theft, he:

***

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

***

(vi) takes or removes the money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof.

18 Pa.C.S. § 3701(a)(1)(ii), (vi). Specifically, Appellant was convicted of three counts of robbery – threat of immediate serious bodily injury, pertaining to three individuals, Ashley McHone, Charles Fulmer, and Jean Gresko. He was also convicted of one count of robbery – financial institution. Finally, Appellant was convicted of one count of fleeing or eluding a police officer, defined as:

**(a) Offense defined.--**Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop, commits an offense as graded in subsection (a.2).

75 Pa.C.S. § 3733(a).

To prove these offenses, the Commonwealth presented testimony of McHone, Fulmer, and Gresko, who were all inside National Penn Bank in Pottstown, Pennsylvania, on June 19, 2013. First, Ashley McHone, an employee of the bank, testified that at approximately 2:50 p.m., two men armed with guns entered the building. N.T. Trial, 7/16/14, at 49-50. McHone stated both men were armed with guns. *Id.* at 50. One of the men, who was armed with a revolver, jumped over the counter and told all of the employees to "get down." *Id.* at 50, 53. That man then "took [McHone] to each of the stations and made [her] open the drawer so he could remove the cash." *Id.* at 53. While this occurred, the man held his gun "in [McHone's] side[,]" making McHone feel afraid that she "wasn't going to go home." *Id.* The other, taller man stood in the lobby of the bank making sure that the employees and customers there "weren't moving." *Id.*

After emptying the cash from the teller stations, the men began to leave the bank, at which point a customer, Charles Fulmer, entered. *Id.* at 54. McHone testified that the armed robbers told Fulmer to lie on the ground and then took bags of money that Fulmer had carried into the bank. *Id.* at 54, 63. When the men then left the bank, McHone "went over to the

window … and … saw a silver[,] sedan-type car going down the road." *Id.* at 56. McHone testified that the car "accelerated quickly" away. *Id.* at 57-58.

Next, Charles Fulmer took the stand and testified that he walked into the bank on June 19, 2013, carrying "two bags of half dollar[]" coins. *Id.* at 91. Fulmer testified when he entered, he saw a man to his right who was "holding a gun…." *Id.* The man told Fulmer to lie "on the floor[,]" took the bags Fulmer was carrying, and immediately left the bank with another man. *Id.*

Jean Gresko, an employee of the bank, also testified for the Commonwealth. She stated that at around 2:50 p.m. on June 19, 2013, she was facing away from the door [of the bank] and [she] heard, 'Get your hands up.'" *Id.* at 100. She turned to see "a person standing there pointing a gun at [her] and [she] just put [her] hands up." *Id.* Gresko saw another man "behind the … teller line." *Id.* at 101. That man also had a gun and was "making a girl go from … teller drawer to teller drawer, taking the money out and put[ting] it in a bag." *Id.* After the men left the bank, Gresko called 911. *Id.* at 102. She then looked out the window and "saw a silver car drive quickly up to the traffic light…, stop[] briefly and [take] a fast left and turn[] left down the street." *Id.* at 103.

The Commonwealth also presented the testimony of several police officers who attempted to stop the silver Hyundai shortly after the robbery. According to their testimony, the vehicle initially stopped on the side of the road, but then fled from police. *See id.* at 151-154, 171-74. Several

officers pursued the vehicle, which eventually stopped in a residential cul-de-sac and the occupants fled on foot. *Id.* at 174-78, 198. After a short search of the area, three men were taken into custody and identified as Iashaq Ibrahim, Wesley Davis, and Appellant. *Id.* at 202, 217, 219, 221. Davis and Ibrahim were wearing clothing that was similar to that worn by the robbers in a video recorded by the bank's surveillance cameras. N.T. Trial, 7/17/14, at 77, 79, 105, 118, 123, 125.

Near the abandoned Hyundai, officers found "several large piles of currency," which had been "placed under … rocks." *Id.* at 53. Additionally, officers found a bag containing money "tucked under [a] wall" near the vehicle. *Id.* at 54. The bag contained $11,377. *Id.* at 115. In the area, officers also discovered a "canvas bank bag that was filled with … 50-cent pieces" and a "clear plastic bag … filled with some type of clothing." *Id.* at 67. Some of the clothing in the bag matched that worn by the bank robbers, as seen in video surveillance footage. *Id.* at 68-69, 76. DNA testing linked Davis and Ibrahim to several of the articles of clothing found in the bag. *Id.* at 104, 108. A Smith & Wesson automatic pistol was also recovered in close proximity to where the vehicle was parked. *Id.* at 83-84, 96. Approximately five months later, a revolver was found in the area, as well. *Id.* at 103. Additionally, a search warrant was obtained for the Hyundai vehicle, and it was discovered that the vehicle was registered to Appellant's father. *Id.* at 111, 126. The search revealed, among other

things, a cloth bank bag and $499 worth of coins in the trunk of the car. *Id.* at 126.

The Commonwealth also presented the testimony of a DNA expert who stated that DNA swabs were taken from Ibrahim, Davis, and Appellant, and were compared to DNA swabs collected from the Smith & Wesson pistol used in the robbery. Specifically, the expert stated that DNA found on the "slide serration" of the Smith & Wesson pistol was collected. The expert explained that area of the gun, as follows:

> [DNA Expert:] Slide serrations are grooves, so as you rack the slide back and forth they kind of have grip to them, so you have to exert a good amount of pressure in order to pull the slide back, and slide serrations put pressure against your fingers. So they are a good surface to collect skin cells.

N.T. Trial, 7/17/14, at 163, 167-68. When the DNA taken from the slide serration of the firearm was compared to Appellant's DNA, it was determined that he "could not be excluded as a major source contributor." *Id.* at 163. The expert then explained:

> [DNA Expert:] Every time we make an association or say that someone cannot be excluded as a contributor, we put a statistical weight to that, we calculate a statistic. In this case we do a statistic where we determine how rare this profile would be within the general population.
>
> So, if I were to select someone at random from the population, and [assess] the chance [that] their DNA would match this profile[,] I would only expect that one person out of more than 7 trillion would match this profile.

*Id.* at 163-64.

- 15 -

Once the Commonwealth rested, Appellant took the stand in his own defense. He admitted that he drove Ibrahim and Davis to the bank, but claimed that he did so only as an unlicensed taxi driver, and he had no knowledge that the men planned to rob the bank. *See* N.T. Trial, 7/17/14, at 219-240. Appellant further testified that he fled from the traffic stop because Ibrahim held a gun to his side and the men directed him to drive away. *Id.* at 245-46. Appellant stated that once he stopped the car at Ibrahim's direction, he fled the scene on foot to escape Ibrahim and Davis. *Id.* 247-49. He claimed that he had no knowledge of, and did not willingly participate in, the robbery of the bank. *Id.* at 249.

This evidence, albeit circumstantial, was sufficient to demonstrate that Appellant was guilty of the above-stated crimes under a theory of accomplice liability.

> It is well-established … that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor. *See* 18 Pa.C.S. § 306; *see also Commonwealth v. Bradley*, 481 Pa. 223, 392 A.2d 688, 690 (1978) (the actor and his accomplice share equal responsibility for commission of a criminal act). A person is deemed an accomplice of a principal if "with the intent of promoting or facilitating the commission of the offense, he: (i) solicit[ed the principal] to commit it; or (ii) aid[ed] or agree[d] or attempt[ed] to aid such other person in planning or committing it." 18 Pa.C.S. § 306; *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 585 (1998). Accordingly, two prongs must be satisfied for a defendant to be found guilty as an "accomplice." *See Commonwealth v. Woodward*, 418 Pa. Super. 218, 614 A.2d 239, 242 (1992). First, there must be evidence that the defendant intended to aid or promote the underlying offense. *See id.* Second, there must be evidence that

the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. *See id.*

*Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004).

Here, Appellant admitted that he drove Ibrahim and Davis to the bank, and waited for them while the robbery occurred. Inside the bank, Ibrahim and Davis brandished guns and pointed them at McHone, Fulmer, and Gresko while taking money from the teller stations and the bags of money carried by Fulmer. These actions placed McHone, Fulmer, and Gresko in danger of immediate, serious bodily injury, or, at the very least, threatened them with the same. *See Commonwealth v. Gillard*, 850 A.2d 1273, 1275-76 (finding sufficient evidence to establish that bar patrons were placed in fear of serious bodily injury to support robbery convictions where defendant waved a gun at the patrons and then took money from the register). Once Ibrahim and Davis obtained the money from the bank's teller stations, and the bags of money possessed by Fulmer, the men left the bank and returned to Appellant's vehicle. McHone and Gresko both testified that they saw Appellant's vehicle drive quickly away from the scene.

When police attempted to stop Appellant's car, he fled both in his car, and later on foot. After the men were found and taken into custody, a search of the area around Appellant's car, and in the trunk of the vehicle, revealed money stolen from the bank, half-dollar coins taken from Fulmer, clothing worn by the bank robbers, and the guns used during the crime. Appellant's DNA was discovered on the Smith & Wesson pistol used during

the robbery, making it reasonable for the jury to infer that Appellant knew Ibrahim and Davis were armed when they went into the bank to commit the robbery, and shared the intent to place the individuals inside the bank in fear of immediate serious bodily injury.

Consequently, the totality of this evidence, viewed in the light most favorable to the verdict winner, was sufficient to prove that Appellant aided Ibrahim and Davis in committing the specific offenses of robbery – threat of immediate serious bodily injury, with regard to each of the victims inside the bank. Additionally, the evidence was sufficient to prove that Appellant acted as Ibrahim's and Davis' accomplice in committing the robbery of a financial institution as defined by section 3701(a)(1)(vi). Finally, the Commonwealth's evidence was more than sufficient to demonstrate that Appellant, as a principal actor, committed the crime of fleeing or eluding a police officer. While Appellant testified that he had no knowledge of the robbery, and claimed that he fled because Ibrahim pointed a gun at him, the jury obviously disbelieved his testimony, which it was free to do. *See Commonwealth v. Blackham*, 909 A.3d 315, 320 (Pa. Super. 2006) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses…. It is not for this Court to overturn the credibility determinations of the fact[-]finder."). Therefore, we agree with Attorney Walko that Appellant's challenge to the sufficiency of the evidence is frivolous.

Our independent review of the record reveals no other, non-frivolous issues that Appellant could assert on appeal. Accordingly, we affirm his judgment of sentence and grant counsel's petition to withdraw.

Judgment of sentence affirmed. Petition to withdraw granted. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/2016